

# EXHIBIT B

3/18/19

## COMMONWEALTH OF MASSACHUSETTS
### SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT

**PLYMOUTH, ss.**

DENNIS RING,

        Plaintiff,

    v.

SRS DISTRIBUTION, INC.,
HERITAGE WHOLESALERS, INC., and
DALE J. BROCCOLI,

        Defendants.

**CIVIL ACTION NO.:** 19 cv 0294 A

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

MAR 1 8 2019

Clerk of Court

## CIVIL COMPLAINT AND JURY DEMAND

### INTRODUCTION

This is an action for damages arising from age discrimination against Dennis Ring while he was employed by Defendants SRS Distribution, Inc. and Heritage Wholesalers, Inc. Plaintiff seeks damages, costs, and attorneys' fees pursuant to General Laws, chapter 151B, § 4. As a result of the Defendants' actions, Plaintiff has suffered damages, including lost wages and benefits, and emotional distress.

### PARTIES

1.  Plaintiff Dennis Ring is an individual who resides at 15 Stetson Court, Plymouth, Massachusetts 02360.

2.  Defendant SRS Distribution, Inc. is a Delaware corporation, registered in Massachusetts, with a principal place of business at 5900 S. Lake Forest Drive, McKinney, Texas 75070.

3.     Defendant Heritage Wholesalers, Inc. is a Massachusetts Corporation with a principal place of business at 1 Salem Street, #3, Swampscott, Massachusetts 01907.

4.     Defendant Dale J. Broccoli is a District Manager at SRS Distribution.  Upon information and belief, he resides in Connecticut.

## JURISDICTION AND VENUE

5.     The Jurisdiction of this Court is lawful and proper as the Plaintiff resides in Massachusetts, Defendants do business there, and the wrongful acts occurred in Massachusetts.

6.     Venue in Plymouth County is lawful and proper as Plaintiff resides there.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     On or around November 8, 2018, Mr. Ring filed a Verified Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD").

8.     On or around January 30, 2019, Mr. Ring caused a Certification of Authorization to Withdraw by Counsel to be filed with the MCAD with intent to file the instant action.

9.     A private right of action ("PRA") was provided to Mr. Ring by the MCAD on or around February 13, 2019.

## FACTUAL COMMON TO ALL COUNTS

10.     Defendant SRS Distribution, Inc. ("SRS") is a company that, *inter alia*, oversees a national network of independent roofing distributors.

11.     Defendant Heritage Distribution, Inc. ("Heritage") is a division of SRS Distribution.  Heritage, *inter alia*, forms a network of independent roofing distributors, assembles roofing teams and delivers roofing products and services.

12.     Defendant Dale J. Broccoli ("Broccoli") is the District Manager at SRS Distribution, Inc.

13.     Plaintiff Dennis Ring ("Ring") is a sixty-year-old white male.

14.     On or around May 2001, Mr. Ring was hired by SRW Contractor's Supply ("SRW"), SRS's predecessor company.

15.     Mr. Ring was hired by SRW's owner, James Warnat, as a store manager in its Weymouth location.

16.     In or around 2002, Mr. Ring was promoted to the level of District Manager, given his high performance and positive job feedback.

17.     Mr. Ring's duties as District Manager included, *inter alia*, overseeing daily operations and sales, trucking and delivery, inventory levels, product selection and purchasing, budgets for sales/operations, and hiring/terminations.

18.     As part of his role as District Manager, Mr. Ring managed three stores, located in Medford, Weymouth, and Plymouth.

19.     In or around early December 2013, SRW was acquired by Metro Roofing Supplies ("Metro").

20.     Mr. Ring continued his position as District Manager under Metro's employment, and retained his previous duties.

21.     While Mr. Ring was District Manager, the annual sales of the three stores in Medford, Weymouth, and Plymouth increased in the following manner: SRW at time of purchase sales were three million dollars annually in 2013; Metro sales then increased to six million dollars annually in 2014; Metro's 2015 sales increased to ten million dollars annually;

and as of 2016, Metro's annual sales, at the time of purchase from SRS, were trending over ten million dollars annually.

22.     On or around December 2016, Metro was acquired by SRS, and thereafter began operating under the name "Heritage."

23.     At the time of the acquisition, Mr. Ring continued his previous duties as District Manager.

24.     On or around the end of December 2016, Mr. Ring was informed by Paul Whelan ("Whelan") and John Marron ("Marron"), who were respectively the Regional Vice President of the Eastern Region and a District Manager, that he would be demoted from the position of District Manager to that of Store Manager of the Plymouth store.

25.     As the Store Manager, Mr. Ring balanced customer service, product handling, and warehouse management without any assistance.

26.     For example, Mr. Ring would typically open the Plymouth store around 4:30 a.m. and perform the following tasks: cleaning out the bathrooms, taking out the rubbish, organizing stock, gathering deliveries for the day, answering questions at the front desk, and making deliveries if necessary.

27.     In the afternoon of a typical day, Mr. Ring would continue to service customers and obtain orders, reconcile receipts, prepare deposits, prepare orders for invoicing, and get custom orders ready for delivery the next day.

28.     Throughout Mr. Ring's time as Store Manager of the Plymouth store, the store was understaffed.

29.     Mr. Ring made numerous requests for additional staffing assistance to Mr. Marron, Mr. Whelan, and Defendants' Human Resources Department.  These requests fell upon deaf ears, as he did not receive appropriate assistance.

30.     Upon information and belief, other store managers at SRS received greater assistance and had more hires in their stores than Mr. Ring.

31.     From December 2016 to October 2017, Mr. Marron was Mr. Ring's direct supervisor.

32.     While he was Mr. Ring's supervisor, Mr. Marron made age-based comments to Mr. Ring, such as "slow down, you're too old," and "don't run so fast," in a disparaging and condescending manner, with an obvious reference to Mr. Ring's age.

33.     In or around late October 2017, Mr. Broccoli was announced as Mr. Ring's direct supervisor.  Mr. Broccoli began his position as Mr. Ring's supervisor on November 1, 2017.

34.     Mr. Broccoli also made a number of age-based comments and engaged in discriminatory conduct toward Mr. Ring.

35.     For example, Mr. Broccoli would make comments to Mr. Ring that he needed to graduate beyond using a "flip" cellular phone.  Mr. Broccoli also remarked to Mr. Ring that "old guys and computers do not mix," and (with a negative tone): "you're just like my dad," and "you're an old fart like my dad."

36.     During the period Mr. Ring worked for SRW and Metro, he received training on the companies' technology and systems.

37.     Mr. Ring did not receive any complaints or negative feedback on his usage and understanding of technology while employed with SRW and Metro.

38.     However, Defendants did not provide adequate training to Mr. Ring related to their technology, such as the "APPO" Report and Inventory Reports.

39.     Defendants provided inventory training to the Plymouth Store in December of 2016.

40.     However, unlike the training provided to other SRS stores, the training provided to Mr. Ring's store did not involve a store manager. The group conducting training consisted of employees that had been with the company only a short time.

41.     The training provided to the Plymouth store pertained only to point of sale issues and did not touch upon writing purchase orders.

42.     This is contrasted with the training provided to SRS's Medford and Weymouth stores, where branch managers conducted the training and written purchase orders were a topic of training.

43.     Specifically, the training conducted in the Plymouth location was insufficient, as the employees conducting such training were either new to the company, new to the business, or unfamiliar with a several building techniques, regional differences in building applications and nomenclature.

44.     During this training period, only one existing branch manager came to the Plymouth store to provide training. In contrast, both the Weymouth and the Medford locations had several store managers to provide training to the staff.

45.     Moreover, Mr. Ring was not invited to a company training in McKinney, Texas, which was attended by all other SRS Store Managers, including the managers of the Medford and Weymouth locations.

46.     The training, referred to as Heritage's Branch Manager Academy, was held in 2017.

47.     When Mr. Ring asked Paul Whelan why he was not asked to attend this meeting, Mr. Whelan's response was "you're a senior guy, you do not need this training."

48.     Mr. Ring was provided an annual physical inventory training, which took place in the fall of 2017 via conference call from Heritage's corporate office.

49.     However, a conference call was an insufficient means by which to provide training. Participating in this conference call was difficult when Mr. Ring was simultaneously required to answer the phones, wait on customers, and try to absorb what was being reviewed for training.

50.     This Annual Physical Inventory training further occurred at too late a time, as Mr. Ring was terminated soon afterward and was not afforded the opportunity be properly trained on Defendants' technology and systems.

51.     Mr. Broccoli also shared details with Mr. Ring of terminating other employees over forty-years-old. Mr. Broccoli relayed to Mr. Ring that he needed to fire his long-time employee, Jackie Hurley, who is age fifty-eight (58).

52.     Ms. Hurley was terminated in or around December 2016 during the sale from Metro Roofing Supply to Heritage. At the time of her termination, she had at least twenty (20) years of experience in the industry.

53.     Mr. Broccoli also terminated the Danbury, Connecticut store manager who was approximately age sixty-two (62), as he was pressured into "resigning."

54.    Mr. Broccoli additionally continued Defendants' previous pattern of declining to provide adequate support to Mr. Ring.  Though Mr. Broccoli would offer to provide help to employees in other stores such as Dartmouth, and Danbury, and Stamford, no assistance was ever given to Mr. Ring.

55.    When the annual store inventory was conducted in the fall of 2017, Mr. Ring again asked for support.  In turn, Defendants sent one person who had no prior experience conducting inventories.

56.    Due to this individual's lack of experience, the inventory was inaccurate by approximately $10,000.

57.    This discrepancy, which occurred through no fault of Mr. Ring, resulted in a first warning notice from Defendants.

58.    On or around November 20, 2017, Mr. Broccoli appeared unannounced at the Plymouth location accompanied by a Heritage employee from the company's accounting department; Jon Marron; and Richard Broccoli.

59.    D.J. Broccoli openly discussed Mr. Ring's situation in front of the other individuals and made a deliberate show of force through writing up Mr. Ring.  At the conclusion of their meeting, Mr. Broccoli stated to Mr. Ring, "you can't run to Dennis Flynn anymore, there are rules and consequences now."

60.    Upon his departure, Mr. Marron apologized profusely to Mr. Ring for the unexpected nature of the situation.

61.    Mr. Ring was not responsible for generating the original numbers upon which this inventory was based.

62.     Moreover, there is no provision in SRS's employee handbook stating or suggesting that a warning is warranted under these circumstances.

63.     Finally, inventory discrepancies of a small size are not unusual in the industry especially in such a turbulent year of higher than expected sales, lack of help, new systems, and general upheaval in terms of operations and sales.

64.     Defendants swiftly followed up with a second warning to Mr. Ring on December 27, which was not on a company form, nor did it seem to follow company procedure.

65.     This warning, written by Mr. Broccoli, is a transparent and pretextual attempt to justify Mr. Ring's imminent termination due to his age.

66.     The memorandum containing this warning notes that the Plymouth store had purchase order variances, that the store failed to take delivery photos (which no other store had done as well), and had not been cycle counting.

67.     All of these issues were apparently known to the Defendants when issuing the first warning to Mr. Ring in November but were not mentioned in that notice.

68.     Instead, Defendants waited until December to inform Mr. Ring that such issues allegedly existed, and thereby provided him with unreasonably short deadlines to address these issues.

69.     Mr. Ring was asked to correct certain issues by December 31, others by January 1, 2018, and other issues by January 2.

70.     Although Mr. Ring tried to address the issues raised, he could not do so in the purposefully unrealistic and short period set by Mr. Broccoli.

71.     In the short period of time Mr. Ring was assigned to correct cycle count issues, he remained short-staffed at the Plymouth store.  He therefore concurrently had to remedy the cycle counts while servicing customers.

72.     Shortly thereafter, Mr. Ring was terminated on January 19, 2018.

73.      Mr. Ring was replaced by an individual who is approximately twenty-five (25) years of age.

74.     Defendants' proffered reasons for Mr. Ring's termination are pretextual.

75.     The $44,000 discrepancy in the Plymouth store's cycle count was due to a clerical error resulting from both negative and positive inventory discrepancies.

76.     The "responsible" party for this clerical error was an inexperienced staff member in product knowledge, product identification, and product receiving procedures.

77.     This clerical error consisted of a unit of measure ("UOM") entry error regarding the store's cedar mill planks, which had been sold incorrectly by the square, rather than by the piece.

78.     Mr. Ring brought this to the attention of the auditor, Jim Murray, on the final day of inventory, around October 28, 2018, Mr. Murray informed Mr. Ring that the clerical error would be straightened out in some sort of "backroom reconciliation."

79.     The discrepancy was accordingly the result of an error in point of sale entry, and occurred through no fault of Mr. Ring.

80.     Furthermore, Defendants' contention that Mr. Ring was trying to intentionally manipulate the Plymouth store's counts to correct any issues is dubious and based on tenuous evidence.

81.     The only support for this unfounded allegation is based on the word of Karen Hood.

82.     As Ms. Hood's former manager, Mr. Ring noted that Ms. Hood was deficient in SRS training, deficient in product knowledge, and deficient in customer service principles.

83.     Ms. Hood was often disruptive in the workplace and did not embody the principles of teamwork.

84.     Defendants' reliance on Ms. Hood's allegations is therefore misplaced.  Upon information and belief, Ms. Hood continued to engage in disruptive behavior after Mr. Ring's termination from Heritage.  This disruptive behavior resulted in the dismissal or transfer of several other Heritage employees

85.     Ms. Hood left Heritage's employ around spring of 2018 without providing notice.

86.     Indeed, the documentation in which Ms. Hood makes these allegations contains no concrete evidence of any wrongdoing.  See Exhibit A.

87.     Instead, Defendants at face value take Ms. Hood's statements that Mr. Ring instructed her to print out new count sheets and use "his numbers."

88.     Finally, the contentions contained in Defendants' warnings to Mr. Ring on November 5, 2017 and December 26, 2017 are blatantly false and pretextual.  See Exhibit B.

89.     For example, these warnings state that Mr. Ring did not investigate the discrepancies occurring within the Plymouth store.  As stated previously, Mr. Ring did investigate the discrepancy involving the UOM entry error and reported it to the appropriate authority.

90.     Moreover, these final warnings did not provide Mr. Ring with adequate time to address the issues brought up.

91.     As a result of Defendants' illegal actions, Mr. Ring was subjected to inappropriate discrimination and harassment from Defendants.

92.     The Defendants discriminated against Plaintiff Dennis Ring based on his age through his wrongful termination.

93.     Defendants allowed Mr. Ring to be discriminated and retaliated against, and engaged in, promoted, and condoned said discrimination and retaliation.

94.     Defendants' conduct has taken away from Mr. Ring's enjoyment of and ability to perform his job, added stress to his life, and diminished his self-esteem.

95.     Defendants' conduct has caused emotional distress to Mr. Ring, leading Mr. Ring to feel worthless, isolated and powerless, in addition to rendering it difficult to go about his daily activities.

96.     Defendants' conduct has further caused Mr. Ring harm in the form of lost wages. Though Mr. Ring is diligently fulfilling his duty of searching for employment, Defendants have inflicted significant damage to Mr. Ring's professional reputation.

97.     Prior to the Defendants' discriminatory conduct, Mr. Ring had never previously been terminated, instead being successfully promoted on an upward scale throughout his career.

98.     As a result of Defendants' actions, Mr. Ring has incurred damages, including in the form of emotional distress and lost wages.

## Count I
## VIOLATION OF G.L. c. 151B, § 4 (1)
### v. SRS Distribution Group, Inc.
### v. Heritage Wholesalers, Inc.

99.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

100.     Mr. Ring, as an individual over forty (40) years old, is a member of a protected class.

101.     Mr. Ring, at all times relevant hereto, performed his job for SRS and Heritage at an acceptable level.

102.     SRS and Heritage terminated Mr. Ring due to his age.

103.     As a result of SRS and Heritage's unlawful conduct, Mr. Ring has sustained damages including but not limited to lost wages, lost benefits, emotional distress, attorneys' fees, costs, and interest.

## Count II
## VIOLATION OF G.L. c.151B, § 4 (4A)
### v. Dale J. Broccoli

104.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

105.     Mr. Broccoli coerced, intimidated, threatened, and interfered with Mr. Ring's exercise and enjoyment of his rights granted and protected by Massachusetts General Laws, chapter 151B.

106.     Mr. Broccoli violated Mr. Ring's right to be free from discrimination in the terms, conditions, and privileges of employment.

107.    Mr. Broccoli's unlawful conduct was based on his intent to discriminate against

Mr. Ring.

## **Prayers for Relief**

WHEREFORE, Plaintiff Dennis ring hereby requests that the Court grant the following

relief:

1.  Enter judgment in his favor and against the Defendants on all counts of the Complaint;

2.  Award Plaintiff damages, including liquidated damages, lost wages, lost benefits,

    attorneys' fees, costs, and interest and order his reinstatement;

3.  Such other and further relief as the Court deems just and proper.

## **Jury Demand**

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.


Respectfully submitted,

DENNIS RING,

By his attorney,


Matthew J. Fogelman, Esq. (BBO # 653916)
mjf@fogelmanlawfirm.com
FOGELMAN & FOGELMAN
189 Wells Avenue, Suite 302
Newton, MA 02459
Tel: (617) 559-1530


Dated: March 14, 2019

# EXHIBIT A

1/22/2018                                          Gmail - cycle counts

 Gmail                                    Karen Hood <karenmariehood@gmail.com>

## cycle counts
1 message

Karen Hood <Karen.Hood@heritagewholesalers.com>                    Mon, Jan 15, 2018 at 1:39 PM
To: Karen Hood <Karen.Hood@heritagewholesalers.com>, "karenmariehood@gmail.com" <karenmariehood@gmail.com>

Documentation

RE: Cycle Counts week of 1/8/18 – 1/12/18

Three of the items for which I counted came up short.

Myself and Dave Vallier recounted these same items again and still they came up short.

I told Dennis about the shortage. His response was he was going to count these items out in the warehouse and "find"

the missing items – he smiled and winked – which means he is changing the counts from being accurate to fiction that is

exactly what he did. He then instructed me to print new count sheets and use "his numbers" and enter them in to the
system.

I was told to throw out the original count sheets for which I did not. I attached them to the fraudulent count sheets, These
counts were

Entered in to the system on Thursday, January 11, 2018.

The items in question are:

Work Order: 2018011012

Securegrip

Froze count at 55

Counted 49

Missing 6

Dennis changed count to 52

Work Order: 2018011009

Resisto

Froze count at 343

Counted 333

Missing 10

Dennis changed to 338

https://mail.google.com/mail/u/0/?ui=2&ik=2d0444af25&jsver=NW_2aT3flA0.en.&view=pt&cat=Personal&search=cat&th=160fb1ea7722f724&siml=160...   1/2

1/22/2018                              Gmail - cycle counts

Work Order: 2018011004

1-1/2 Coil Nails

Froze count at 10

Counted 2

Missing 8

Dennis changed to 6


*Karen Hood*

Heritage Wholesalers

15 Robert J. Way

Plymouth, MA 02360

Tel: 508-830-9400

Fax: 508-830-9432


*"Integrity is doing the right thing even when nobody's watching"*



# EXHIBIT B

# Employee Discipline Notice                    SRS Acquisition Corporation

Employee Name: Dennis Ring                    Date: 11/20/2017

Social Security No. _____          Branch: HWELY

## Type of Violation (Check All That Apply):

| | | |
|---|---|---|
| ☐ Unexcused Absence | ☐ Violation Company Drug/Alcohol Policy | ☐ Dishonesty or Theft |
| ☐ Tardy/Early Quit | ☐ Failure to Follow Instructions/Insubordination | ☐ Violation of Company Safety Rule(s) |
| ☐ Rudeness to Customers/Employees | ☐ Damage to Company Material/Equipment | ☐ Unsatisfactory Driving Record or Driving Accident |
| ☐ Substandard Work Performance | ☐ Violation of Company Policies or Rule(s) of Conduct | ☑ Other (Specify) Unsatisfactory |

## Previous Contacts: (See Employee Gluebook for Description of Company Discipline Policy)

| Place Check (✓) Mark by Warning Given | Oral Warning | Written Warning | Suspension | Date | By Whom |
|---|---|---|---|---|---|
| Step 1 | | Not Applicable | Not Applicable | | |
| Step 2 | Not Applicable | | Not Applicable | | |
| Step 3 | Not Applicable | Not Applicable | | | |

## Employer Statement:

Date of Incident: 11/5/2017                    Time of Incident: _____

Supervisor Description of Incident: Inventory item variances were not properly investigated and corrected at the time of inventory, WOV discrepancies that has could entered in physical count not fixed after reasing high false positive variances.

Name of Witness(es), if any: _____

## Action Taken:

☐ Oral Warning      ☐ Written Warning      ☐ Suspension      ☐ Termination

Consequence should incident occur again: _____

I have read this Employee Discipline Notice and Understand it:

_Dennis Ring_                                   Date 11/20/2017
Signature of Employee

_____                               Date 11/20/2017
Signature of Supervisor

Distribution: Copies to Employee, Local Personnel File, HR in McKinney

SRS 000002

To: Dennis Ring

From: DJ Broccoli

Date: 12/26/2017

Subject: Job Performance and Expectations

Dennis,

Due to a lack of implementation of key operating processes it has become necessary for me to move beyond verbal coaching and e-mails and issue you a final written warning for job performance. Despite the verbal coaching and e-mails, Plymouth is consistently the worst performing location in virtually all of the key operating areas.

- Despite my direction you have failed to make any progress on addressing the 46 open AP/PO variances that the branch currently has. 10 of which are over 10 weeks old. Each week the total of unaddressed variances continues to grow.
- You have failed to lead and direct your team to comply with taking delivery photos. Under your leadership the location has taken ZERO jobsite photos. You have been asked several times to comply with this directive but there has been no progress made.
- Under your leadership Plymouth has not conducted job site inspections despite being asked multiple times to do so.
- Plymouth has 108 open sales orders, transfers, or purchase orders. Failing to close these in a timely manner leads to missed sales opportunities
- Cycle counting has not been effectively implemented in Plymouth despite this practice being required. As a result of not performing cycle counts, Plymouth had the highest inventory variance in the company at over $46,000

It is imperative that you immediately address the issues noted above. It is my expectation that you have all unresolved APPO variances older than 5 weeks closed completed by 1/5/18, all December jobsite inspections completed by 12/31/17, all open sales orders, PO's, transfers, completed by January 1, 2018. Additionally, I expect cycle counting to begin the first week of January and for all variances to be properly researched and written actions implemented to prevent inventory variances over $250. Lastly, I expect over 80% jobsite photo score and zero hour of service violations from Plymouth beginning 1/2/18. Please understand that we have discussed these issues far too long without action or results. These processes and procedures are in place to ensure that we have sound inventory controls and sound operating branches. Failure to execute these expectations will result in further disciplinary action that could include termination.

Respectfully,

DJ Broccoli
District Manager