**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**DENNIS RING,**

**Plaintiff,**

**v.**

**SRS DISTRIBUTION, INC.,**
**DALE BROCCOLI,**

**Defendants.**

**Case No. 19-cv-10896-DJC**

**MEMORANDUM AND ORDER**

**CASPER, J.** **July 19, 2021**

## I. Introduction

Plaintiff Dennis Ring ("Ring") filed a complaint against his former employer, SRS Distribution Inc. ("SRS"), and his former manager, Dale Broccoli ("Broccoli") (collectively, "Defendants"), claiming Defendants discriminated against him based on his age in violation of Mass. Gen. L. c. 151B, § 4. D. 1-2. Defendants have moved for summary judgment. D. 30. For the reasons stated below, the Court ALLOWS the motion.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a

genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III. Factual Background

The following facts are undisputed unless otherwise noted and are drawn from the parties' statements of material facts. See D. 32; D. 36-1. SRS is a roofing supplier and distribution company, headquartered in McKinney, Texas, with approximately 300 locations in 42 states nationwide. D. 32 ¶¶ 1-2; D. 36-1 ¶¶ 1-2. In late 2016, SRS acquired Metro Roofing Supply ("Metro") and Metro's three branches in Massachusetts. D. 32 ¶ 3; D. 36-1 ¶ 3. On the date of the acquisition, Metro terminated all its employees, including Broccoli and Ring. Id. Both Broccoli and Ring eventually returned to Metro as individual branch managers. D. 32 ¶ 4; D. 36-1 ¶ 4.

### A. Post-Acquisition Shift in Management

Around November or December 2016, Ring became Plymouth Branch Manager. D. 32 ¶ 8; D. 36-1 ¶ 8. SRS branch managers are responsible for the day-to-day operations of the branch and are responsible for such duties as managing branch operations efficiently, ensuring accurate inventory control, inventory record keeping, following, devising and implementing procedures for daily branch operations consistent with SRS guidelines and maintaining adequate staffing. D. 32 ¶¶ 15-16; D. 36-1 ¶¶ 15-16. The branch manager reports to a district manager who oversees a

district composed of multiple branches. D. 32 ¶ 17; D. 36-1 ¶ 17. In December 2016, once Metro's acquisition was complete, Ring and other new SRS employees received onboarding training from SRS. D. 32 ¶ 9; D. 36-1 ¶ 9. Ring disputes whether the training he received was effective. D. 36-1 ¶ 9. In addition to the onboarding training, Ring and other Northeast branch managers attended a two-day branch manager meeting in February 2017. D. 32 ¶ 14; D. 36-1 ¶ 14.

SRS tracks sales, purchases and inventory through two reports: the Accounts Payable and Purchase Order ("APPO") and the Agility Report. D. 32 ¶¶ 32-34, 42-44; D. 36-1 ¶¶ 32-34, 42-44. The APPO report tracks the number of outstanding purchase orders ("PO") a branch may have. D. 32 ¶ 32-34; D. 36-1 ¶¶ 32-34. On March 31, 2017, SRS's Northeast Controller, Jim Murray ("Murray"), offered to assist any branch with outstanding APPO, including District Manager Jon Marron ("Marron"), Broccoli and Ring. D. 32 ¶ 73; D. 36-1 ¶ 73. Ring's Plymouth branch ranked near the top half of all other branches in January and February 2017, but starting in March 2017, consistently ranked last, or near the bottom, of the APPO report. D. 32 ¶¶ 68-69; D. 36-1 ¶¶ 68-69. Between March 2017 and October 31, 2017, the Plymouth Branch ranked last six times and among the bottom-five branches fourteen times. D. 32 ¶¶ 69, 76, 82-84; D. 36-1 ¶¶ 69, 76, 82-84.

From November 2016 to around November 2017, Ring reported to Marron. D. 32 ¶ 18; D. 36-1 ¶ 18. On November 1, 2017, SRS reorganized its districts, thereby promoting Broccoli from branch manager to district manager for three Connecticut branches in Stamford, Danbury and North Haven and two Massachusetts branches in Plymouth and North Dartmouth. D. 32 ¶ 19-20; 49-50; D. 36-1 ¶¶ 19-20, 49-50. On October 18, 2017, after the realignment announcement, but before the effective date, Broccoli emailed Ring to introduce himself as his new manager and noted that Plymouth had "some pretty aggressive growth targets." D. 32 ¶¶ 51-52; D. 36-1 ¶¶ 51-52. Broccoli sent an email to Ring detailing his goals and "district initiatives," and instructed Ring to

prioritize the APPO. D. 32 ¶ 85; D. 36-1 ¶ 85. Broccoli also emailed Ring on several occasions, offering to help him meet this requirement. Id. Ring's performance did not improve and, post-alignment, Ring's branch consistently ranked last on the APPO report. D. 32 ¶¶ 152-53, 158, 164; D. 36-1 ¶¶ 152-53, 158, 164.

### B. Performance Issues and Termination

A month after the branch realignment, SRS discovered that Ring's branch had the largest inventory irregularity in the company. D. 32 ¶ 59; D. 36-1 ¶ 59. Broccoli investigated the matter and discussed the discrepancy with Ring on or around November 5, 2017. D. 32 ¶ 60; D. 36-1 ¶ 60. Due to the error, SRS incorrectly reported $44,775 in additional inventory. D. 32 ¶¶ 65-66; D. 36-1 ¶¶ 65-66. Ring disputes being at fault for the error. D. 36-1 ¶ 63. On or around November 26, 2017, Ring received a verbal warning for his failure to investigate and correct the variance. D. 32 ¶ 66; D. 36-1 ¶ 66. On December 2, 2017, Broccoli emailed Ring asking him to "[p]lease let me know what we need to do to clean this up" and noting that Broccoli could "have someone from another branch" help resolve the outstanding Agility items. D. 32 ¶ 103; D. 36-1 ¶ 103. Ring did not accept the assistance and represented that the matter was "being worked on now" and that he would "be reviewing [the Agility] report along with the APPO . . ." D. 32 ¶ 105; D. 36-1 ¶ 105.

Ring's performance ultimately worsened, with the branch ranking last on the Agility reports for December 8 and 18, 2017. D. 32 ¶¶ 106-108; D. 36-1 ¶¶ 106-108. On December 27, 2017, Ring received a letter from Broccoli requiring that "all unresolved APPO variances older than 5 weeks [be] closed [and] completed by [January 5, 2018], all December jobsite inspections completed by [December 13, 2017], all open sales orders, PO's [sic], transfers completed by January 1, 2018." D. 32 ¶¶ 144-47; D. 32 ¶¶ 144-47. The letter noted that "[f]ailure to execute

these expectations will result in further disciplinary action that could include termination." D. 32 ¶ 147; D. 36-1 ¶ 147. Ring acknowledged the deficient areas identified by Broccoli and noted that they were not a surprise to him and that he had been told multiple times to improve in these areas. D. 32 ¶ 148; D. 36-1 ¶ 148. On December 29, 2017, SRS published the Agility report for December 21, 2017, which ranked Ring's branch as the worst performing branch with 114 open items. D. 32 ¶¶ 149, 151; D. 36-1 ¶¶ 149, 151. At this time, Ring's branch was the worst performing branch of Broccoli's five branches. D. 32 ¶ 153; D. 36-1 ¶ 153.

On January 8, 2018, Broccoli emailed Ring, following up on the December 27 letter and identifying areas in which Ring failed to meet expectations. D. 32 ¶¶ 156-157; D. 36-1 ¶¶ 156-157. The email explained that as of January 5, 2018, Ring's branch showed 31 open APPO items outstanding for more than five weeks and had failed to meet the expectation that all open POs be closed before December 31, 2017. D. 32 ¶¶ 157-59; D. 36-1 ¶¶ 157-59. The January 12, 2018 APPO report and Agility report again ranked Ring's branch in last place. D. 32 ¶¶ 163-64; D. 36-1 ¶¶ 163-64. SRS terminated Ring on January 19, 2018. D. 32 ¶ 165; D. 36-1 ¶ 165.

## IV. Procedural History

Ring instituted this action on March 18, 2019 in the Plymouth Superior Court. D. 1. Defendants removed the action to this Court. Id. Defendants have now moved for summary judgment. D. 30. The Court heard the parties on the pending motion and took the matter under advisement. D. 44.

## V. Discussion

### A. Considering Direct Evidence

Ring alleges that SRS terminated him due to his age, in violation of Mass. Gen. L. c. 151B, § 4. D. 1-2 ¶¶ 100-102. A plaintiff may establish age discrimination through either direct or

circumstantial evidence. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-143 (2000). "If an employee makes a sufficiently strong showing of discrimination using direct evidence, but the employer responds with a showing of legitimate reasons for the actions it took, then the court may view the employer as having mixed motives—some legitimate, some not." Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 64 (1st Cir. 2002). "[I]nherently ambiguous statements," however, "do not qualify as direct evidence." Id. at 65.

Here, Ring offers his testimony about instances in which Broccoli or Marron made age-related comments to Ring, including Marron telling Ring, "slow down, you're too old" and "don't run so fast." D. 36-1 ¶ 213. Marron allegedly made these comments when he was still Ring's supervisor, id., prior to Ring's later termination in 2018 when he was supervised by Broccoli. Once Broccoli became Ring's direct supervisor in 2017, during the transition period between October and November 2017, Ring alleges Broccoli also made age-related comments including, "you're just like my dad," D. 36-1 ¶ 217, and "computers and old guys don't mix," id. However, "direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decisionmakers unrelated to the decisional process itself." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996). As to Marron's remarks, Marron did not play a role in Ring's termination decision and the remarks made by either Marron or Ring "lack the necessary link between the alleged speaker's discriminatory remark and the adverse employment decision." Id.; see Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 42 (1st Cir. 2002) (noting that "comments by non-decisionmakers . . . normally are not 'direct evidence' of age-based animus"). Several of Broccoli's alleged remarks, including "you're just like my dad" or "all old farts have flip phones," were made when Broccoli and Ring were still employed by Metro, D. 36-1 ¶ 174, prior to Metro's acquisition by SRS in 2016, id. ¶ 175, and

years prior to Broccoli's promotion as Ring's supervisor in 2017, id. ¶ 214, or his termination in January 2018. Even given these remarks, without more, do not "unambiguously display age-based animus," Vesprini, 315 F.3d at 42, particularly where none of these comments were made in relation to or in temporal proximity with Ring's later termination.

**B. Considering *McDonnell Douglas* Burden-Shifting Framework**

*1. Prima Facie*

Absent direct evidence of discrimination, in its application of Mass. Gen. L. c. 151B, the Court may "follow the three-stage order of proof set forth by the United States Supreme Court under the Federal antidiscrimination provisions of Title VII," the McDonnel Douglas framework. Blare v. Husky Injection Molding Sys. Bos., Inc., 419 Mass. 437, 441 (1995); Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008). Under this framework, which both parties employ in their arguments, D. 31 at 6, D. 36 at 12, the burden is first on the plaintiff to establish a prima facie case of age discrimination. Torrech-Hernandez, 519 F.3d at 48. Establishing a prima facie case requires the plaintiff show that "he was at least 40 years old; that his job performance met his employer's reasonable expectations; that he experienced an adverse employment action; and that younger persons were retained in the same position or that the employer otherwise did not treat age neutrally." Currier v. United Tech. Grp., 393 F.3d 246, 254 (1st Cir. 2004).

If the plaintiff succeeds in establishing these elements, the burden shifts to the employer to articulate "a legitimate, nondiscriminatory basis for its adverse employment action." Torrech-Hernandez, 519 F.3d at 48 (citation omitted). If successful, "the presumption generated by the employee's prima facie case disappears, and the employee then has the burden to prove that the reason advanced by the employer for the adverse employment action constituted a mere pretext for unlawful age discrimination." Koster v. Trans World Airlines, Inc., 181 F.3d 24, 30 (1st Cir.

1999); see Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc., 804 F.3d 127, 129-30 (1st Cir. 2015) (explaining that plaintiff must show "that age was the but-for cause of the employer's adverse action").

The first and third elements of the McDonnell Douglas framework are undisputed—Ring was over 40 years of age at the time of his termination and did experience an adverse employment action. Turning to the second element of the McDonnell Douglas framework, Ring must show that "his job performance met his employer's reasonable expectations." Currier, 393 F.3d at 254. Defendants have presented significant evidence that preceding Ring's termination, he consistently ranked last on APPO and Agility reports, D. 32 ¶¶ 69, 76, 82-84, and that he was repeatedly made aware of the branch's failure to meet the company's goals for the district. The letter Broccoli sent to Ring on December 27, 2017 acknowledged that the Plymouth branch was "consistently the worst performing location in virtually all of the key operating areas" and identified areas of improvement. D. 32 ¶¶ 144-46. By December 2017, Ring's branch ranked as the worst performing branch with 120 open items compared to the next lowest ranking branch, which had 37 open items. D. 32 ¶ 108; D. 36-1 ¶ 108. Ring did not improve, received another letter communicating lack of progress, D. 32 ¶ 156, and was soon after terminated. On this undisputed record, his job performance failed to meet his employer's expectations at the time the adverse employment action occurred. See Currier, 393 F.3d at 254.

Ring argues his employer's expectations were not reasonable and that any failure to meet SRS and Broccoli's expectations were due to reasons other than his own shortcomings. D. 36 at 13. Ring relies upon evidence indicating that any inability to complete his work to SRS's satisfaction was the result of SRS's alleged failure to adequately staff or train members of Ring's branch, or its failure to give Ring adequate time to correct branch issues. Such issues, however,

are "business decision[s] that we may not question in an employment discrimination case." Melendez v. Autogermana, Inc., 622 F.3d 46, 53 (1st Cir. 2010) (noting that employer's "decision to adopt a new sales quota is a business decision that we may not question in an employment discrimination case"); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir.1991) (noting that "[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions"). Moreover, it is undisputed that at various points, Ring was offered help to meet company goals and did not accept the assistance. D. 36-1 ¶ 73 (noting that on March 17, 2017, the Northeast Regional Controller informed struggling branches, including Plymouth, to reach out to him and that he would assist with resolving APPO variances); Id. ¶¶ 71-72 (noting that on May 15, 2017, Marron asked Ring if he "need[ed] a hand" with the outstanding APPO and Ring said the APPO would be "clean" by the end of the week and that he would call Marron if assistance was needed); Id. ¶ 74 (noting that Ring emailed Marron on May 21, 2017 regarding the Plymouth branch's APPO performance, stating that he "should make a significant dent in these this week and they will be completed before month end").

It is additionally undisputed that Ring "acknowledged the deficient areas identified by Mr. Broccoli in the December 27 warning, that they were not a surprise to him and that he had been told time and again to improve these areas." Id. ¶ 148. Ring points to a 2016 "Talent Review," predating the Plymouth branch's issues with rankings, in which the report stated that SRS should "lower [Ring's] salary," that he was "not a good fit," and that he had a "[b]ad attitude, not well thought of from the Metro guy." Id. ¶ 180. While this review indicates that issues with Ring's employment record might have gone beyond the Plymouth branch's poor performance, the review provides additional evidence that Ring was not meeting expectations for reasons unrelated to

Ring's age. Accordingly, while the Court is "[m]indful that an employee's burden at the prima facie stage is not particularly onerous," Melendez, 622 F.3d at 51, the Court finds that the evidence submitted by Ring is insufficient to establish that he adequately performed his job as a branch manager.

*2. Pretext*

Even if Ring presented sufficient circumstantial evidence to establish a prima facie case of age discrimination, the burden of production shifts to Defendants to articulate a non-discriminatory reason for the termination. Defendants have met their burden with the record here that Plymouth branch's repeated rankings at the bottom of the APPO and Agility reports, and Ring's failure to improve the Plymouth branch following several letters delineating company goals and requirements, led to Ring's eventual termination. Accordingly, the Court turns to the final stage of inquiry, in which the burden shifts to Ring who "must put forth sufficient facts for a reasonable fact-finder to conclude that [Defendants'] proffered reason for discharging him is a pretext . . ." Melendez, 622 F.3d at 52. To meet his burden at this stage in the McDonnell Douglas analysis for a c. 151B claim, "'Massachusetts is a pretext only jurisdiction,' so a plaintiff . . . 'need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its actions against him were not the real reasons for that action.'" Brader v. Biogen, Inc., 983 F.3d 39, 59 (1st Cir. 2020) (quoting Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 682 (2016)). In determining whether Ring's evidence is sufficient to show that the reasons provided for his termination were a pretext for discrimination, the Court is "not concerned with whether the stated purpose [for SRS's actions] 'is unwise or unreasonable,'" Woodward v. Emulex Corp., 714 F.3d 632, 639 (1st Cir. 2013) (quoting DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993)), or whether Ring's "dismissal was unjust or wrongful," Melendez, 622 F.3d at 52-53.

Rather, Ring must show that Defendants' justification for his termination "is untruthful." Woodward, 714 F.3d at 639.

The Court must not "consider [a] statement standing alone but instead . . . look at all the evidence presented in the totality of the circumstances." Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996) (holding that employer's statement, "[w]hy do I need a 71 year old when I can have a 51 year old," was inadequate for a jury to draw a reasonable inference that the proffered reason for terminating the employee was pretextual given employee's inadequate performance and declining sales). "[T]he issue for purposes of establishing pretext 'is not whether reasonable jurors could find that [Defendants] lacked good cause to terminate [Ring] . . . but, rather, whether [Ring] made a substantial showing that the reason given for the termination was false." Tian v. Aspen Tech., Inc., 53 F. Supp. 3d 345, 365 (D. Mass. 2014) (quoting Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000)). In support of his assertion that Defendants' reasons for terminating Ring were merely a pretext, Ring again references the remarks made by Marron and Broccoli and argues that the Talent Review from March 2017 shows that Broccoli sought to replace Ring prior to Broccoli's performance issues. D. 36 at 14-17. Ring argues the series of warnings were "merely an [sic] pretextual attempt to protect SRS against potential litigation . . ." Id. at 17. The Talent Review, however, while it speaks of Ring's alleged "[b]ad attitude" and mentions he was "not well thought of from the Metro guy," id. at 14, makes no mention of age or provides any basis for a factfinder to infer Defendants' reference to Ring's performance issues as the cause of his termination is a purported pretext.

Ring again points to Broccoli's alleged remarks in this context, D. 36 at 2, but "mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and

contextual relevance." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001). Here, Broccoli's alleged remarks began when Broccoli was not yet Ring's direct supervisor or district manager, but rather, two years earlier, when Broccoli was a branch manager for Metro. D. 36 at 2. Although Broccoli allegedly made similar remarks during his transition period between October and November 2017, D. 36 at 5, these comments were made months prior to Ring's eventual termination in 2018. Moreover, it is undisputed that Ring's performance issues began prior to Broccoli's transition, as Ring's branch ranked last twice in September 2017. D. 36-1 ¶ 82. Without more, Ring's proffered evidence cannot permit a reasonable factfinder to reach the conclusion that that Defendants' proffered reason for terminating Ring—his branch consistently performing the worst of all SRS branches both prior to and following Broccoli's promotion—was pretextual.

**C. Interference with the Right to Be Free from Discrimination**

Ring additionally claims that Broccoli "coerced, intimidated, threatened, and interfered with [Ring's] exercise and enjoyment of his rights," pursuant to Mass. Gen. L. c. 151B, § 4(4A). D. 1-2 ¶¶ 105-106. Section 4(4A) "has two clauses, only one of which (the second) provides protection against retaliation." Lopez v. Commonwealth, 463 Mass. 696, 707 (2012). Ring's claim, pursuant to the first clause of § 4(4A) prohibits "interfere[nce] with . . . the exercise or enjoyment of any right granted or protected by this chapter." Mass. Gen. L. c. 151B, § 4(4A). To establish a claim for unlawful interference under this provision, a plaintiff "must show that [the defendant] interfered with [his] rights under the statute 'in deliberate disregard of those rights,'" which requires a showing of an "intent to discriminate." Furtado v. Standard Parking Corp., 820 F. Supp. 2d 261, 278 (D. Mass. 2011). A defendant "need not be an employer to be subject to an interference claim under Section 4(4A). Lopez, 463 Mass. at 706; see Beaupre v. Cliff Smith &

Assocs., 50 Mass. App. Ct. 480, 491 (2000). "[T]he element of intentionality is satisfied where it is shown that a defendant knowingly interfered with the plaintiffs' right to be free from discrimination." Lopez, 463 Mass. at 710-11. "In cases based on circumstantial evidence of discrimination, individuals may be held liable if: (1) they had the authority or the duty to act on behalf of the employer; (2) their action or failure to act implicated rights under the statute; and (3) there is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's protected rights allowing the inference to be drawn that there was intent to discriminate or interfere with the complainant's exercise of his rights." Furtado, 820 F. Supp. 2d at 278.

Here, it is uncontested that Broccoli, as Ring's supervisor, had the authority to act on behalf of SRS. See D. 36-1 ¶¶ 51, 214. A claim under Section 4(4A), however, is "derivative of the underlying age discrimination claim and thus fails as a matter of law where the court has concluded there was no age discrimination." Coogan v. FMR, LLC, No. 15-cv-13148-GAO, 2018 WL 4405614, at *11 (D. Mass. Sept. 17, 2018) (citing Araujo v. UGL Unicco-Unicco Operations, 53 F. Supp. 3d 371, 383 (D. Mass. 2014) (noting that "to maintain a claim under § 4(4A), the plaintiff must allege, at a minimum, facts showing that he was subjected to discrimination")); see McLaughlin v. City of Lowell, 84 Mass. App. Ct. 45, 74 (2013) (noting that "[a]bsent actionable discriminatory conduct, there exists no basis on which to ground a claim of interference [under c. 151B, § 4(4A)]"). For all the reasons discussed above that the underlying age discrimination fails, Ring has also failed on this claim as well. He has failed to proffer evidence from which a reasonable jury could conclude that Broccoli had any "intent to discriminate," Furtado, 820 F. Supp. 2d at 279, or deliberately disregard Ring's rights pursuant to Mass. Gen. L. c. 151B, § 4(4A).

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 30.[1]

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

[1] Defendants' motion to file a reply brief, D. 39, is ALLOWED *nunc pro tunc* and the Court considered same in the resolution of the motion for summary judgment. Since it appears that D. 43 was intended to substitute for D. 42, the Court DENIES D. 42 as moot. Ring moved to strike, D. 43, Broccoli's reply affidavit and the right-hand column of a chart Defendants provided in their reply brief to illustrate alleged inconsistencies in Ring's testimony, D. 39-1 at 12-33. The Court did not rely upon the Broccoli reply affidavit or the referenced column in reaching the ruling set forth above. Accordingly, the motion to strike Defendants' reply brief, D. 43, is DENIED as moot.